**NATIONAL WELFARE RIGHTS OR-
GANIZATION et al., Appellants,**

v.

**F. David MATHEWS, Secretary of the
Department of Health, Education
and Welfare.**

**No. 75–1741.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 4, 1975.

Decided Feb. 20, 1976.

Henry A. Freedman and Steven J. Cole, New York City, with whom Carolyn M. Heft and Adele M. Blong, New York City, and Florence Roisman, Washington, D. C., were on the brief for appellant organizations.

Lawrence Silver, Deputy Atty. Gen., Harrisburg, Pa., Chief, Litigation of the Comm. of Pa. was on the brief for appellant Com. of Pa.

Richard A. Graham, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., John A. Terry, William M. Brodsky and Ann S. DuRoss, Asst. U. S. Attys., Washington, D. C., were on the brief for appellee.

Joel J. Rabin, Asst. Atty. Gen., State of Md., Baltimore, Md., was on the brief for appellant State of Md.

Ronald A. Zumbrun, John H. Findley, Sacramento, Cal., John H. Midlen, Jr., Washington, D. C. and Glenn E. Davis, Sacramento, Cal., filed a brief on behalf of Pacific Legal Foundation as amicus curiae urging affirmance.

Before WRIGHT, Circuit Judge, LUMBARD,* Senior Circuit Judge for the Second Circuit and TAMM, Circuit Judge.

Opinion for the Court filed by Circuit Judge TAMM.

TAMM, Circuit Judge:

This appeal challenges the validity of a recent regulation promulgated by the Secretary of Health, Education and Welfare ("HEW") which purports to specify maximum amounts of resources allowable to recipients of Aid to Families with Dependent Children ("AFDC"), types of resources which are exempted in whole or part, and the manner of valuation of these resources. Plaintiff-appellants—Pennsylvania, Maryland and various organizations representing welfare recipients—allege, generally, that the regulation impinges the power granted by Congress to states to determine the resources a needy family may retain and, specifically, that the regulation is arbitrary and capricious because it contravenes the aims of AFDC and is unsupported by factual bases in the administrative record. Although we affirm the trial court ruling that

* Sitting by designation pursuant to 28 U.S.C.

the Secretary has power to promulgate regulations prescribing valuation, exemptions, and upper limits on resources of AFDC recipients, we reverse the judgment upholding the challenged rule. Not only does the regulation at issue here conflict with its enabling statute insofar as it values property without regard to encumbrances, but also the scanty administrative record is insufficient to support the factual determinations expressed in the rule.

## I. CONTESTED REGULATION

On July 9, 1973, HEW gave notice of a proposed rulemaking which would establish limits on resources.[1] 38 Fed.Reg. 18254. Two years later HEW promulgated the regulation at issue which provides in pertinent part:

> The amount which may be reserved by an AFDC family of up to 4 persons, other than the reasonable value of a home as determined by the State agency, wedding and engagement rings, heirlooms, an automobile of a retail market value of $1200 or less and equipment and material of reasonable value necessary to implement a plan, approved by the agency, for employment, or rehabilitation, shall not be in excess of a market value of $2250. If the retail market value of the automobile exceeds $1200, the excess value shall be counted against the personal property reserves. For each additional eligible person, an additional $100 in personal property reserves above the $2250 limit may be allowed. Real and personal property shall be valued at their gross market value including encumbrances.

40 Fed.Reg. 12507 (1975).[2] The promulgation also responded briefly to six "primary" types of objections raised in the 57 comments received during the rulemaking.

In June of 1975, plaintiffs filed the complaint in this case and obtained a temporary restraining order prohibiting the AFDC portion of 45 C.F.R. § 233.20(a)(3)(i) from going into effect on June 17. Before the trial court ruled on plaintiffs' motion for a preliminary injunction, the Secretary republished the challenged regulation with an expanded preamble explaining the basis and purpose of the regulation and responding further to comments. 40 Fed.Reg. 30963 (1975). The trial court subsequently denied plaintiffs' motion for a preliminary injunction and granted defendant's motion for summary judgment. It held that the Secretary is authorized by statute to regulate amounts and valuation of resources retained by AFDC families and that the regulation is both reasonable and issued in compliance with the Administrative Procedure Act. J.A. at 223–24. The judge, however, stayed the effective date of the regulation in order to give plaintiffs time to appeal. Plaintiffs appealed and this court extended the stay.

We face two distinct issues in this appeal. We must first decide whether the Secretary has the power to regulate standards indicating the resources to be considered against the state standard of need, a maximum limit on those resources, and the proper valuation of them. Second, if we find that such power exists, we must still determine whether the Secretary exercised that power reasonably and in accord with procedural

---

1. The proposed regulation differed from the final regulation in that it exempted the entire value of the home for adult recipients and allowed no exemption for a motor vehicle owned by an AFDC family. 38 Fed.Reg. 18254, § 233.-20(a)(3) (1973). Under the present regulation, the $1200 value is exempt if used pursuant to an approved plan of employment or rehabilitation. Any excess is counted in the family's $2250 resource allowance. In either case, the value is "retail market value," the selling price on the open market in that geographical area, without consideration of encumbrances.

2. The regulation sets different resource limitations for recipients of four other welfare programs administered by HEW—Old Age Assistance ("OAA"), Aid to the Blind ("AB"), Aid to the Permanently and Totally Disabled ("APTD"), and Aid to the Aged, Blind or Disabled ("AABD"). The regulation allows a maximum figure of $2250 for the spouse and recipient of these programs; it also exempts personal effects and an automobile and income-producing property, regardless of value. Plaintiffs have not challenged these portions of the rule affecting adult welfare programs.

mandates. We turn now to the issue of the Secretary's authority.

## II. POWER TO REGULATE

AFDC was established under the name of Aid to Dependent Children in Title IV of the Social Security Act of 1935, P.L. 74–271. Now, as then, the basic scheme of the assistance program is that the federal government provides funds to the states for distribution to needy children under a plan approved by the Secretary.[3] In order to be approved, state plans must meet specifications set out in 42 U.S.C. § 602(a) (Supp. III 1973),[4] and may not impose a more stringent residency requirement than that the prescribed in the statute, *id.* at § 602(b). Any plan which meets these requirements must be approved by the Secretary. *Id. See also Arizona State Department of Public Welfare v. HEW,* 449 F.2d 456, 461, *rehearing and rehearing en banc denied* (9th Cir. 1971), *cert. denied,* 405 U.S. 919, 92 S.Ct. 945, 30 L.Ed.2d 789 (1972).

■ Section 1302 grants to the Secretaries of HEW, the Treasury, and Labor the authority to "make and publish such rules and regulations, not inconsistent with this chapter, as may be necessary to the efficient administration of the functions with which each is charged under this chapter." Under this broad grant of power, the Secretary may promulgate regulations binding on the states. *King v. Smith,* 392 U.S. 309, 317, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968); *Arizona State Department of Welfare v. HEW, supra,* 449 F.2d at 467; *Solman v. Shapiro,* 300 F.Supp. 409, 413 (D.Conn.), *aff'd per curiam,* 396 U.S. 5, 90 S.Ct. 25, 24 L.Ed.2d 5 (1969). In upholding a different HEW regulation, one court described this far-ranging authority as follows:

A more plenary great [*sic*] of rule-making power would be difficult to devise. . . .

The breadth of the rule-making authority of § 1302 is underscored when seen in the perspective of the entire federal statutory scheme of public assistance. The various programs provided for authorize the Secretary of HEW to require, in the welfare field, that each state incorporate in its plan "such methods of administration . . . as are found by the Secretary to be necessary for the proper and efficient operation of the plan. . . " It is clearly contemplated that in this way the Secretary can, through review and scrutiny of state plans, be instantly apprised of problems in the federally-funded assistance programs and rectify or eliminate troublesome areas in whatever way he, as his expertise may direct him, finds most effective and within the purposes of the public assistance statutory fabric.

*Serritella v. Engleman,* 339 F.Supp. 738, 752 (D.N.J.) (footnote omitted), *aff'd per curiam,* 462 F.2d 601 (3d Cir. 1972).

Appellants here do not deny this general power to regulate, but argue that the exercise of authority is invalid because it is inconsistent with the Act. The major thrust of plaintiffs' argument is that Congress, in enacting the Social Security Act of 1935, set up a basic federal framework for assistance to dependent children within which the states were free to determine the standard of need and level of benefits. They argue that legislative history and recent Supreme Court decisions conclusively prove that HEW's regulation goes far beyond the limited federal rule envisioned by Congress. HEW, on the other hand, refers us to the basic assumption that federal

---

**3.** The 1935 Act provided for administration by the Federal Security Administrator, but these functions were transferred to the Secretary of HEW by section 5 of the 1953 Reorganization Plan No. 1. *See* 42 U.S.C. § 601 notes (1970).

**4.** These requirements include, *inter alia,* statewide effect, financial participation by the state, central administration, disregard of portions of

income of independent children and their relatives receiving aid, provision of family services, and consideration of resources and income of recipients. The regulation at issue in this appeal attempts to set guidelines for the required consideration of income and resources specified in section 602(a)(7).

spending may be limited by the department charged with administration of the assistance program and to the fact that since 1955 HEW has prescribed a maximum on resources. For the reasons discussed below, we hold that the type of regulation challenged in this case is consistent with the cooperative spirit of federalism pervading assistance programs.

The legislative history of the Social Security Act of 1935 reveals that Congress intended to leave to the states many determinations in the administration of the program.[5] Representative Doughton, in reporting the bill from the House Ways and Means Committee, stated:

> In fact, these provisions limit very strictly the supervisory powers of the Social Security Board over the States, and provide a maximum of State control in these matters. The federal standards or conditions included in the law may, indeed, be regarded as minimum conditions, leaving to the States the determination of policies, the detailed administration, the amount of aid which shall be given, and questions of personnel.
>
> . . . . . .
>
> It takes into account the variations in standards and in cost of living in different parts of the country. . . .

79 Cong.Rec. 5469–70 (1935). In another colloquy, Representative Doughton again stressed the state responsibility for determining the amounts to be received:

> Mr. McLAUGHLIN. May I inquire how the determination is to be made in the individual's case as to the amount which that individual is to obtain?

Mr. DOUGHTON. That will be under State law and will be determined entirely by State law.

Mr. McLAUGHLIN. Will there be different formulas set up in the different States, or will there be one national formula?

Mr. DOUGHTON. No; the National Government will not have anything to do with it. The administration of the law is left entirely to the States.

*Id.* at 5474. The legislative history in the Senate points out that this state determination was permitted in large part to assure that poor states could limit the amount of aid given:

> A State will not have to aid every child which it finds to be in need. Obviously, for many States, that would be too large a burden.

Senator Harrison, 79 Cong.Rec. 9269 (1935).

The Supreme Court has reasserted in numerous welfare cases the cooperative federalism underpinning the AFDC program. *See, e. g., New York Department of Social Services v. Dublino,* 413 U.S. 405, 414, 93 S.Ct. 2507, 37 L.Ed.2d 688 (1973); *Jefferson v. Hackney,* 406 U.S. 535, 542, 92 S.Ct. 1724, 32 L.Ed.2d 285, *rehearing denied,* 409 U.S. 898, 93 S.Ct. 178, 34 L.Ed.2d 156 (1972); *Dandridge v. Williams,* 397 U.S. 471, 478, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970); *King v. Smith, supra,* 392 U.S. at 316, 88 S.Ct. 2128 (1968). Each state has the undisputed power to determine the standards of need and the level of benefits. *King v. Smith, supra* at 318–19, 88 S.Ct. 2128. The standard of need is "the amount deemed necessary by the State to maintain a hypothetical family at a subsistence level." *Shea v. Vialpando,* 416 U.S. 251, 253, 94 S.Ct. 1746, 1750, 40

---

5. This acknowledgement of states' interests and responsibilities for children seems to have been in partial recognition of states' rights, even at the expense of national uniformity.
> Mr. KELLER. I am going to say that the committee has done a wiser thing than I had sought to do, though we are looking at the same subject with the same object in view. That is this: I was perfectly willing that the Government should pay, but when I came to study it over I had to agree that as a matter of organization the people in the locality

know what ought to be paid to the different ones better than any possible Government agency. . . .
> Mr. LUNDEEN. Should not all American citizens be treated alike?
> Mr. KELLER. I agree with the gentleman, because, let me confess, I am a nationalist, broadly speaking, but I must, nevertheless, understand and keep in mind that there is a reason for the existence of the States and their sovereignty as it has existed.

79 Cong.Rec. 5550 (1935).

L.Ed.2d 120 (1974). The level of benefits is the amount of the need which the state chooses to pay.

Plaintiffs argue that the regulation challenged here invades the province of the states because it requires the programs to apply national standards, rather than to exercise the discretion granted them by Congress. The standard of need, they contend, includes the establishment of reserves and must, therefore, be determined by the states, and not by HEW.

We find this argument unconvincing for several reasons. First we note the gradual legislative encroachment on state determinations via amendments of the 1935 statute, including the 1939 amendment requiring states to consider income and resources of the recipients. We also consider persuasive the fact that, although HEW has prescribed a dollar maximum on resources since 1955, Congress has not sought to limit this regulatory activity despite subsequent revision of section 602(a)(7). Finally, careful reading of the Supreme Court cases does not lead us to believe that standard of need, clearly determinable by the state, perforce includes standard of reserves. We shall discuss these reasons *seriatim.*

The regulation in question attempts to set federal guidelines for section 602(a)(7) which requires state plans to take into consideration any income or resources of the recipient. The subsection was added in 1939, 53 Stat. 1379, to assure that benefits were available only for needy children. One court has described the provision as a precaution to assure that "no Little Orphan Annie will receive public assistance if she has a Daddy Warbucks." *Arizona State Department of Public Welfare v. HEW, supra,* 449 F.2d at 469 n. 19. An identical provision was also inserted into the requirements for old age assistance and aid to the blind; legislative history of all three provisions, therefore, is relevant to the issue before us.

From the limited discussion of the income and resources amendment, no clearcut Congressional intent appears. A House floor debate on the proposed amendment, H.R. 6635, revealed conflicting views. Representative McCormick expressed his opinion that

what constitutes need is left to the States; in other words, the Federal Government, by the Social Security Act, does not undertake to say to any State what constitutes need. For example, one State might exempt the equity in a house up to $2,000, another one $3,000, while another State might say, "No; we will allow no equity." The Federal Government does not concern itself with that, but leaves the matter entirely up to the States.

84 Cong.Rec. 6704 (1939). *See also id.* at 6852 (remarks of Representative Stefan). Representative Duncan, however, criticized states which required absolute necessity and insisted that "that is absolutely not required under the Federal Social Security Act," *id.* at 6704, suggesting that state discretion was indeed limited by federal guidelines. Representative Brewster also declared that the new amendment was restrictive in that the language mandated states to take resources such as house equity into consideration. *Id.* at 6705. At a later debate on Representative Dirksen's proposed amendment to H.R. 6635 which would have forbidden states to consider resources of adult children or relatives of old age recipients, Representative Poague asserted that the federal agency might use the income and resources clause to force states to remove certain recipients from the welfare rolls, *id.* at 6922, but Representative Magnuson insisted that which resources should be taken into consideration was a matter for the state. *Id.* Even if we were examining the issue of the Secretary's power to regulate resource limitations illumined only by the conflicting history of the 1939 amendment,[6] we find the disparate views

---

**6.** Rejection in the Senate of the Schwellenbach amendments to H.R. 6635 which, *inter alia,* would have prevented denial of old-age assistance to persons owning real property of $2500 and personal property of $500, 84 Cong.Rec. at 9004–06 (1939), does not resolve the conflict.

expressed and the minor weight to be given floor debate, *see* 2A, Sutherland, Statutory Construction 217, § 48.13 (4th ed. 1973), insufficient to rebut the broad grant of rulemaking authority.

We are, moreover, cognizant of the continuing development of the Act in the more than 25 years since subsection 7 first appeared and would be remiss in ignoring this evolution of the AFDC program. Since its inception in 1935, AFDC has encountered continuing legislative concern and action.[7] As national attitudes changed toward assistance programs, Congress reflected these opinion swings by amending the structure of the AFDC program. In this way Congress deleted the provision allowing states to impose moral standards on recipients, *see King v. Smith, supra,* 392 U.S. at 320–26, 88 S.Ct. 2128, it also added to section 602(a), which prescribes requirements for state plans, subsections compelling states to encourage work programs by discounting portions of income, § 602(a)(8) (1968), and disregarding any expenses reasonably attributable to earning such income, § 602(a)(7) (1962). Amendments even limited the right to determine need by requiring the states to adjust amounts to reflect cost of living increases, § 602(a)(23) (1968). It is clear that under the Supremacy Clause state plans must conform to these amended requirements. *King v. Smith, supra,* 392 U.S. at 333 n. 34, 88 S.Ct. 2128. While the Court has been hesitant to find total preemption of state discretion, *New York Department of Social Services v. Dublino, supra,* 413 U.S. at 418–22, 93 S.Ct. 2507 (work programs), it has struck down state regulations which violate the spirit of the amendments. *See, e. g., Shea v. Vialpando, supra,* 416 U.S. at 263–65, 94 S.Ct. 1746 (Colorado fixed sum for earning expenses regardless of actual costs); *King v. Smith, supra,* 392 U.S. at 325–27, 88 S.Ct. 2128 (Alabama "substitute father" rule); *Lewis v. Martin,* 397 U.S. 552, 557–60, 90 S.Ct. 1282, 25 L.Ed.2d 561 (1970) (California statute requiring consideration of income of nonadoptive stepfather or man assuming the role of spouse without proof of actual contribution). This increased control over state AFDC programs leads us to believe that whenever Congress has acted to limit state choices, it is reasonable to presume that Congress also intended to extend the Secretary's rulemaking authority in that area of concern. *See generally Almenares v. Wyman,* 334 F.Supp. 512, 521 (S.D.N.Y.1971), *modified on other grounds,* 453 F.2d 1075 (2d Cir. 1971), *cert. denied,* 405 U.S. 944, 92 S.Ct. 962, 30 L.Ed.2d 815 (1972).

In addition to this history of increasing requirements for state plans, and thus restricting state discretion, we note that since 1955 HEW has imposed limitations on the states regarding income and resource considerations. The Supplement to the 1955 *Handbook of Public Assistance Administration,* a widely distributed manual recognized by the Supreme Court in *King v. Smith, supra,* established limits of $1500 per recipient.[8] In 1966 the Secretary increased the limit to $2000 per recipient, *id.,* § 3021 (1966), a limit which later appeared in HEW regulations, 45 C.F.R. § 233.20(a)(3)(i) (1974). For 20 years HEW has imposed maximum limits in approving state plans.

---

The rejection may have stemmed from the other attached provisions, the amounts suggested, or general disagreement as to whether an amendment to subsection 7 was necessary in order for the federal plan to be able to set resource limits.

7. In addition to the 1939 amendment adding clause 7, Congress also amended requirements for state plans in 1950, 64 Stat. 549, 558; 1956, 70 Stat. 849; 1962, 76 Stat. 185, 188; 1965, 79 Stat. 418, 423; 1968, 81 Stat. 877, 879, 881, 890, 892, 895, 896, 898; 1971, 85 Stat. 803, 804; 1972, 86 Stat. 1462, 1492; and 1975, 88 Stat. 2348, 2349, 2359, 2360.

8. The *Supplement* provided in pertinent part:

At the present time, $1,500 is the maximum limit that has been approved for any State plan when specified sums are set out for specified types of property. When the State uses the $1,500 limit, it has been requested to bring the automobile within the $1,500, although all states do not do so.

HEW, Handbook of Public Assistance Administration of 1955: Supplement for Administrative Use, § 3120 (1955).

The challenged regulation, therefore, is unique in its resource limit provisions only because the amount of $2250 for a family of four is considerably less than the $8000 figure applicable from 1966 until the present. While appellants may seek to challenge the amount selected as arbitrary, they can hardly argue that the Secretary is suddenly usurping state power by setting any limit at all. We note also that Congress amended section 602(a)(7) in 1962 to assure that expenses incurred in earning an income would be deducted from income considered by the state. Even if the legislative history of the 1939 amendment does not specifically support a grant of rulemaking authority at that time, Congress appears to have acquiesced in the Secretary's power to set resource limits by allowing the limitations to stand when it reconsidered the Act.[9] *See generally Snell v. Wyman,* 281 F.Supp. 853, 867 (S.D.N.Y.1968), aff'd per curiam, 393 U.S. 323, 89 S.Ct. 553, 21 L.Ed.2d 511 (1969).

In light of this power to set maximums, we see no reason to believe that Congress meant to prohibit the Secretary from determining the manner in which resources will be valued. The Ninth Circuit has rejected a similar challenge to HEW regulations, *Arizona State Department of Public Welfare v. HEW,* 449 F.2d 456 (1971). The court upheld a regulation based on section 602(a)(8) prescribing the manner in which earned income would be disregarded.[10] Arizona challenged the regulation as violative of the state's power to set the standard of need and level of benefits. Looking to the general regulatory power of section 1302 and the specific language of section 602(a)(8), the court rejected Arizona's claim. The court also validated a regulation calling for a state-level advisory committee:

**9.** This finding of acquiescence is buttressed further by the disinclination of Congress to amend section 1302. During the 1972 amendment of the Social Security Act, the Senate Report of H.R. 1 proposed limiting the Secretary's rulemaking authority "so that it may issue regulations only related to specific provisions of the Act," rather than the broad language currently existing. S.Rep. No. 92-1230, 92d Cong., 2d Sess. 460 (1972). The bill finally adopted did

More than most statutes, the Act was and is responsive to the changing landscape of American society; its beneficent purposes would be stultified by rigidly attributing to each Congressional attempt to improve the Act's responsiveness a concomitant Congressional intent not to permit further administrative improvements by those charged with the Act's implementation.

*Id.* at 472.

The power to determine which assets may be disregarded—heirlooms, a home of reasonable value, business tools—presents slightly greater problems. The states for 40 years have made these determinations with little or no restriction by HEW. We cannot, however, say with any certainty that the area is one forbidden to the Secretary. It would seem, instead, that HEW has recognized for some time its ability to set limits on state discretion in these matters, but has elected not to do so. The first *Handbook,* prepared in 1949, gave wide latitude to state policies that provide "[d]efinitions of the amounts of real and personal property that can be retained, . . . *provided, that such definitions will assure that only needy individuals are eligible"* (emphasis added). 1949 *Handbook* at § 3120(1). In the 1955 *Handbook: Supplement for Administrative Use,* section 3120 noted HEW's preference for the states to include the value of the car if they allowed the maximum limit. See note 8 *supra.* It also indicated that HEW had decided "at present" not to set any maximums on certain resources as long as the states responded within the "rule of reason." 1955 *Handbook Supplement* at § 3120(1). The 1966 *Handbook* observed that within the $2000 per recipient maximum no specific limit had

not contain this limitation. See Pub.L. No. 92–603.

**10.** The regulation prescribed that expenses should be deducted from net income, *i. e.,* total income minus income disregarded under section 602(a)(8), while the Arizona plan provided that expenses would be deducted from gross income before determining the amount of income to be disregarded. 449 F.2d at 469–70.

been set on the home, personal property, automobile and income-producing property; the states were cautioned, however, that the definitions must "assure that only needy individuals are eligible." § 3120(1). HEW has also prohibited states from counting home produce, section 3121; loan proceeds used to purchase property not convertible for current needs, section 3122; and small infrequent gifts from relatives, section 3123. *Id.* The fact that in the past HEW has allowed states to operate with great latitude in setting specific limits for such items as housing, automobiles, and personal property does not indicate a restrictive interpretation by the department of its power to regulate. The manuals and subsequent regulations reveal an underlying assumption that the Secretary could set these limits whenever necessary to assure that AFDC benefits would go to needy individuals.

Neither do we believe that these limits destroy the state's power to determine a standard of need. *See, e. g., King v. Smith, supra,* 392 U.S. at 318–19 n.14, 88 S.Ct. 2182. Each state still must determine the amount necessary to maintain a family (or individual recipient) in that state, including the sum for items such as housing, transportation, and clothing. This flexibility is sufficient to assure that the state retains substantial control over the determination of who is a needy individual in spite of national rules for counting each family's resources. *See generally Arizona State Department of Welfare v. HEW, supra,* 449 F.2d at 470–71; *Connecticut State Department of Public Welfare v. HEW,* 448 F.2d 209, 215 (2d Cir. 1971). A family limited to $2250 of reserves will continue to receive benefits based on the sums which its state determines are necessary in that locale.

For example, a state which determines that transportation expenses are high because recipients must obtain reliable vehicles to traverse long distances over difficult terrain may adequately protect the interests of recipients by setting a higher standard of need, even though the challenged regulation would count any auto value over $1200 as a resource to be considered against the standard of need.

■ For these reasons, we do not believe that this type of regulation impermissibly limits the states in their cooperation with the federal government to provide funds for families with needy children; it is therefore within the rulemaking authority of the Secretary.[11]

## III. VALIDITY OF REGULATION

Plaintiff-appellants allege that, even if the Secretary has power to regulate standards for resources, the promulgated rule is invalid because it conflicts with the purposes of the Act and because HEW failed to articulate sufficient bases for the changes.

■ The standards by which we must evaluate the challenged regulation are lenient ones which require great deference to the Secretary's expertise. A regulation promulgated under such a broad grant of authority is valid if it is "reasonably related to the purposes of the enabling legislation." *Mourning v. Family Publications Services, Inc.,* 411 U.S. 356, 369, 93 S.Ct. 1652, 1661, 36 L.Ed.2d 318 (1973), *quoting Thorpe v. Housing Authority of the City of Durham,* 393 U.S. 268, 280–81, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969). This standard applies to HEW regulations promulgated under section 1302, *Johnson's Professional Nursing Home v. Weinberger,* 490 F.2d 841, 844 (5th Cir. 1974). Other courts have tested

11. As a peripheral matter we observe the unusual posture which plaintiff welfare organizations have assumed in this case: arguing for supremacy of state standards over federal guidelines. Because federal standards have in the past been more generous and provided greater benefits, welfare organizations have argued traditionally that states should not be able to subvert federal policies. *See, e. g., New York Department of Social Services v. Dublino,* 413 U.S. 405, 93 S.Ct. 2507, 37 L.Ed.2d 688 (1973); *Lewis v. Martin,* 397 U.S. 552, 90 S.Ct. 1282, 25 L.Ed.2d 561 (1970); *Houston Welfare Rights Organization, Inc. v. Vowell,* 391 F.Supp. 223 (S.D.Tex.1975); *cf. National Welfare Rights Organization v. Weinberger,* 377 F.Supp. 861 (D.D.C.1974). It would seem that the highest possible benefits, and not the highest form of federalism, is the objective of nonstate plaintiffs.

AFDC regulations by determining if they were unreasonable and contrary to the Act. *Connecticut State Department of Public Welfare v. HEW, supra,* 448 F.2d at 216; *Almenares v. Wyman, supra,* 334 F.Supp. at 521. *See also* 42 U.S.C. § 1302 (1970).

█ In addition to these substantive standards a regulation must be promulgated in accord with procedural requirements of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 *et seq.* (1970), and any further rules imposed by the department itself. *Rodway v. Department of Agriculture,* 514 F.2d 809, 814 (D.C.Cir. 1975). *See also* 36 Fed.Reg. 2532 (1971), adopting § 553 requirements for HEW rulemaking. The income and resource regulation challenged here was promulgated following notice and opportunity for comment,[12] 38 Fed. Reg. 18254 (1973), but appellants claim that in spite of these actions 45 U.S.C. § 233.-20(a)(3)(i) violates section 706(2)(A) of the APA[13] because the notice and subsequent promulgation failed to provide the factual objective support for the regulation necessary for proper judicial review. We find merit in both of appellants' claims.

## A. Contrary to Statute

Both the standard of "reasonably related" and the statutory prohibition against regulations "inconsistent with this chapter," 42 U.S.C. § 1302, recognize that regulations must advance, rather than impede the legislative goals. The general objectives of the AFDC program appear in 42 U.S.C. § 601 (1970):[14]

[f]or the purpose of encouraging the care of dependent children in their own homes or in the homes of relatives by enabling each State to furnish financial assistance and rehabilitation and other services . . . to help maintain and strengthen family life and to help such parents or relatives to attain or retain capability for the maximum self-support and personal independence consistent with the maintenance of containing parental care and protection . . . .

The Secretary argues that the fair market value rule is related to the objectives that only the needy receive aid and that recipients be helped to attain financial independence. We find it unnecessary to decide if the application of this provision is reasonably supportive of either objective[15] be-

---

**12.** The rulemaking was done pursuant to 5 U.S.C. § 553(c) (Supp. IV 1974), which provides in pertinent part:

(c) After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose.

**13.** This statute provides that the reviewing court shall:

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—
(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

5 U.S.C. § 706(2)(A) (1970).

**14.** This overall purpose is supplemented by specific objectives inferable from individual provisions of the Act, such as encouraging employment, section 602(a)(8), (14), (15), (19).

**15.** We do observe, however, that much of HEW's argument is unsupported by fact and is often specious. For example, HEW alleges

that compelling states to disregard encumbrances will discourage recipients from buying luxury items on credit and thus avoid the burdensome monthly payments that drain their limited finances. HEW, however, has not attempted to limit this rule to luxury items and would also apply it to items such as refrigerators, furniture, and automobiles necessary for work; there are, moreover, no facts to show that AFDC families purchase a great many luxury items. Compelling a recipient to dispose of a heavily-encumbered item basic to maintenance (or one worth less than the amount of encumbrance) places the individual in a far worse living condition without improving his ability to meet daily needs. It is extremely difficult to see a reasonable relationship between the effects of this rule and its avowed purpose of aiding the recipient to become independent. The Secretary also claims that this method of valuation will prevent payments to "those who have placed themselves in a position of need due to the purchase of heavily encumbered items." 40 Fed.Reg. 30963 (1975), preamble to regulation as republished. This rationale ignores the fact that no recipient could place himself in need in this manner under a valuation system which considers encumbrances. The equity, equal to his invest-

cause it clearly conflicts with other provisions of the Act, as expressed in the statute itself and in the pertinent regulations.

Numerous cases within the past few years have held invalid state regulations that include as resources income not actually available for maintenance of the recipients. *See, e. g., Shea v. Vialpando,* 416 U.S. 251, 94 S.Ct. 1746, 40 L.Ed.2d 120 (1974) (standard allowance for work-related expenses); *Lewis v. Martin,* 397 U.S. 552, 90 S.Ct. 1282, 25 L.Ed.2d 561 (1970) (support from nonadoptive stepfather or MARS); *Johnson v. Harder,* 383 F.Supp. 174 (D.Conn.1974), *aff'd per curiam,* 512 F.2d 1188 (2d Cir. 1975) (surplus OASDI benefits); *National Welfare Rights Organization v. Weinberger,* 377 F.Supp. 861 (D.D.C. 1974) (recoupment of overpayments); *cf. Riemer v. Hooker,* 392 F.Supp. 145 (D.N.H. 1975) (child care costs). Prior to the 1975 revisions, HEW regulations specified that "only such net income as is actually available for current use on a regular basis will be considered and only currently available resources will be considered." 45 C.F.R. § 233.20(a)(3)(ii)(c) (1974). Relying in part on this regulation, courts have struck down state plans which valued property without regard to encumbrances. *Green v. Barnes,* 485 F.2d 242, 244 (10th Cir. 1973); *Smithson v. Flowers,* Civ.No. 74–18CH (S.D.W.Va. April 18, 1974); *see also Gillett v. Rose,* Civ.No. 216166 (Utah Dist.Ct. Jan. 10, 1974) (mortgage disability insurance benefits).

Defendants urge that these cases are inapposite inasmuch as they rely on the availability requirement which existed prior to this regulation. The revised regulation still requires states to consider "currently available resources," § 233.20(a)(3)(ii)(c), but (a)(3)(i) specifically decrees that this available real and personal property must be valued without regard to encumbrances.

■ Contrary to HEW's assertions, we believe that availability is required by the statute as well as by the regulation and that failure to consider encumbrances is inconsistent with other interpretations of the requirement. In *King v. Smith,* the Supreme Court noted that the availability regulation "clearly comports" with the purposes of section 602(a)(7), and "properly excludes" resources merely assumed to be available. 392 U.S. at 319 n.16, 88 S.Ct. 2128. This interpretation of the statute was reaffirmed in *Lewis v. Martin, supra,* 397 U.S. at 555, 90 S.Ct. 1282. *See also Solman v. Shapiro, supra,* 300 F.Supp. at 415. We cannot accept HEW's contention that because the property itself is available, gross market value (and not the equity) is available. *Contra Wheat v. Hall,* 32 Cal. App.3d 928, 108 Cal.Rptr. 508, 113 Cal.Rptr. 873 (Ct.App.1973), *cert. denied,* 415 U.S. 925, 94 S.Ct. 1430, 39 L.Ed.2d 481 (1974). Such an interpretation is in direct opposition to the principles which require valuation of life insurance at its cash value, *Wilczynski v. Harder,* 323 F.Supp. 509 (D.Conn.1971), and consideration of the actual expenses in earning income, *Shea v. Vialpando, supra,* as well as contrary to fiscal realities.[16] The courts' unwillingness to assume benefits not actually in existence

ment, would still be counted as a resource. Furthermore, payments are not subtracted from his available income or added to the statewide standard of need. For example, a family of four with $2300 in assets could not come within the limitations by investing $100 in a $400 refrigerator. The $100, and subsequently monthly increases in equity, would still be attributable to the family. No economic sleight of hand can make this disappearing asset theory any more than an illusion. The only reason advanced by the Secretary which appears clearly related to the regulation is to assure that AFDC families appear poorer than non-benefited families. Although we need not decide the issue, we doubt whether this aim can

be presumed from the beneficent objectives specific in section 601.

16. *See also Hein v. Burns,* 402 F.Supp. 398 (S.D.Iowa 1975). A three-judge court declared invalid food stamp regulations which included as income a recipient's educational travel allowance but disallowed a deduction for the actual costs of transportation. Holding that the regulations conflict with the remedial purposes of the Act, the court stated:

Under this record the travel allowance is spent entirely to defray commuting expenses. Therefore, receipt of such allowance has no effect on food purchasing power.

*Id.* at 405.

is explained in *Cooper v. Laupheimer,* 316 F.Supp. 264, 269 (E.D.Pa.1970) as a response to "the reality of public welfare—the necessity of current payments for current needs." To assume that furniture worth $200 on which a family still owes $180 can be miraculously converted into $200 defies the laws of economics and punishes welfare recipients for the type of credit purchases also common to working families. Just as AFDC prohibits the assumption of current availability of potential income or income expended as earning costs, so does it prevent the presumption that encumbered property has a value to the HEW recipient of its total fair market value.

We are confident that HEW can find ways to regulate consideration of these resources without distorting the financial realities. *See, e.g., Gillett v. Rose, supra,* unreported opinion at 4–5 (mortgage disability insurance payments may be counted only to the extent of rent or home maintenance need); *Riemer v. Hooker, supra,* 392 F.Supp. at 146–47 (allowing state to pay child care costs rather than allowing as an AFDC deduction). The method selected here, however, must fail because it conflicts with the spirit of the AFDC program.

### B. *Insufficient Record*

In addition, a more basic flaw underlies the entire regulation. In considering the challenge to HEW's selection of a $1200 figure as the proper exemption for a necessary automobile or the $2250 limitation placed upon family resources, we find ourselves unable to evaluate the reasonableness of these figures. Neither the notice of proposed rulemaking nor the Secretary's responses to comments in March and July of 1975 give any insight into the bases for these determinations. As we have noted previously, judicial review is meaningless where the administrative record is insufficient to determine whether the action is arbitrary and capricious.[17] *See, e. g., International Harvester Co. v. Ruckelshaus,* 155

U.S.App.D.C. 411, 478 F.2d 615, 628–47 (D.C.Cir. 1973); *Kennecott Copper Corp. v. EPA,* 149 U.S.App.D.C. 231, 462 F.2d 846, 849–51 (1972). Even within the narrow scope of review mandated in this case, support for the Secretary's actions must appear in the record.

HEW alleges that the regulation represents a policy determination and therefore needs no supporting empirical data. We agree that the regulation does clearly express policy decisions to discourage buying on credit, to prevent accumulation of luxury items, to assure a difference between assets of working and welfare families, and to cut welfare costs. *See* 40 Fed.Reg. 30963 (1975). The choice of amounts of limitation, however, "turn[s] crucially on factual issues" and therefore requires "sufficient attention to these in the statement to allow the fundamental rationality of the regulations to be ascertained." *Amoco Oil Co. v. Environmental Protection Agency,* 163 U.S. App.D.C. 162, 501 F.2d 722, 740–41 (1974).

The "basis and purpose" statement required by Section 4(c) of the APA must be sufficiently detailed and informative to allow a searching judicial scrutiny of how and why the regulations were actually adopted. In particular, the statement must advert to administrative determinations of a factual sort to the extent required for a reviewing court to satisfy itself that none of the regulatory provisions were framed in an "arbitrary" or "capricious" manner.

*Id.* at 739 (citations omitted). Judge J. Skelly Wright, author of the *Amoco* decision, has suggested that an adequate record for section 553 rulemaking will reflect "all of the relevant views and evidence considered by the rulemaker, from whatever source, and—like a mini-history—it must reveal if and how the rulemaker considered each factor. . . ." Wright, *The Courts and the Rulemaking Process: The Limits of Judicial Review,* 59 Cornell L.Rev. 375, 395

---

**17.** An adequate notice of proposed rulemaking serves, of course, an additional purpose. Alerting interested parties to relevant factors and empirical data allows the comment procedure to serve its intended goal. Parties informed of underlying considerations are far more apt to present informative, responsive comments.

(1974). In this case, the belated attempts by counsel to provide a basis for these choices cannot substitute for a sufficient record.[18] *See, e. g., Portland Cement Association v. Ruckelshaus,* 158 U.S.App.D.C. 308, 486 F.2d 375, 395 (1973), *cert. denied,* 417 U.S. 921, 94 S.Ct. 2628, 41 L.Ed.2d 226 (1974).

For a regulation of this type to withstand judicial scrutiny, HEW must provide a more precise articulation of findings and relevant factors. Although some commentators have suggested that agency reconsideration in order to provide a satisfactory record may be of little benefit to a challenging party, *see Williams, "Hybrid Rulemaking" Under the Administrative Procedure Act: A Legal and Empirical Analysis,* 42 U.Chi.L.Rev. 401, 424–25 (1975), we are convinced that the three-step procedure of section 553, when properly applied, can provide an adequate basis for the substantive review mandated by the arbitrary and capricious standard.

Step one of section 553 will yield the agency's initial proposal, its tentative empirical findings, important advice received from experts, and a description of the critical experimental and methodological techniques on which the agency intends to rely. Step two will produce the written or oral replies of interested parties to the agency's proposals and to all the other "step one" materials. And step three will furnish the final rule, accompanied by a statement both justifying the rule and explaining its normative and empirical predicates through reference to those parts of the record developed in steps one and two.

Wright, *supra,* 59 Cornell L.Rev. at 395.

## IV. CONCLUSION

For the reasons discussed above, we hold that, despite the Secretary's power to promulgate regulations regarding the manner of valuation and amount of permissible resources for AFDC recipients, the regulation challenged in this appeal is invalid. Valuing resources without regard to encumbrances violates the cardinal principle of AFDC that only resources actually available may be counted in determining whether the recipient is within the state's definition of a standard of need. Furthermore, review of the regulation is impossible because the promulgation consistently failed to articulate factual determinations underlying the decisions of the Secretary. For these reasons, we remand the case to the district court for the entry of a judgment declaring the regulation invalid. Injunctive relief does not appear to be required at this time. *Poe v. Gerstein,* 417 U.S. 281, 94 S.Ct. 2247, 41 L.Ed.2d 70 (1974).

*So ordered.*

---

18. These after-the-fact justifications are even more suspect in the case of the $1200 limit for a car. An affidavit submitted at trial indicated that this figure would permit the purchase of a three-year-old car. J.A. at 174, Affidavit of John A. Svahn, Acting Administrator of the Social and Rehabilitation Service Division of HEW. This affidavit was amended a few weeks later to state that when the regulation was actually promulgated in 1975, $1200 represented the price of a five-year-old car, rather than the three-year-old car it would have purchased in 1973 when the rulemaking was announced. *Id.* at 206.