NATIONAL ASSOCIATION OF FOOD
CHAINS, INC. and Eastern Meat
Packers Association, Petitioners,

v.

INTERSTATE COMMERCE COMMIS-
SION et al., Respondents,

Colonial Refrigerated Transportation,
Inc., et al., Intervenors.

No. 75–1471.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 14, 1976.

Decided May 18, 1976.

Ronald K. Kolins and Allan I. Mendelsohn, Washington, D. C., with whom Lauren R. Oldak and Edwin H. Pewett, Washington, D. C., were on the brief for petitioners.

Peter A. Fitzpatrick, Atty., I. C. C., Washington, D. C., with whom Fritz R. Kahn, Gen. Counsel, I. C. C. and John H. D. Wigger, Atty., Dept. of Justice, Washington, D. C., were on the brief for respondents. Charles H. White, Jr., Atty., I. C. C., Washington, D. C., also entered an appearance for respondent I. C. C.

Paul M. Daniell, Atlanta, Ga., of the bar of the Supreme Court of Georgia pro hac vice, by special leave of court, with whom E. Stephen Heisley, Washington, D. C., was on the brief, for intervenors Colonial Refrigerated Transportation, Inc., and others.

Elliott Bunce, Washington, D. C., was on the brief for intervenor Southern Motor Carriers Rate Conference, Inc.

R. M. Tettelbaum and Bruce E. Mitchell, Atlanta, Ga., were on the brief for intervenor Refrigerated Transport Co., Inc.

Allan I. Mendelsohn and J. Bruce Davis, Washington, D. C., filed a brief on behalf of the Colorado Meat Dealers Ass'n as amicus curiae.

Richard A. Peterson, Lincoln, Neb., entered an appearance for intervenor, Curtis, Inc.

Before BAZELON, Chief Judge, and TAMM and ROBINSON, Circuit Judges.

PER CURIAM:

## I. BACKGROUND

This petition for review challenges a decision of the Interstate Commerce Commission which limited the scope of service which must be offered by the class of motor common carriers known as meat haulers. Petitioner National Association of Food Chains ("NAFC") is a nonprofit organization of retail food chains; the other petitioner, the Eastern Meat Packers Association ("EMPA"), is a trade association of independent meat packers. The intervenors are motor common carriers that transport loose meat and carcass meat pursuant to authorization by the Commission.[1]

Prior to 1958, tariffs for the transportation of loose and carcass meats generally provided for unloading by the receiver (consignee) rather than by the carrier. In 1958

---

1. The intervenors that have participated in briefing are Refrigerated Transport Co., Inc., Southern Motor Carriers Rate Conference, Inc., Altruk Freight Systems, Central and Southern Truck Lines, Inc., Clay Hyder Trucking Lines, Inc., Coldway Food Express, Inc., Colonial Refrigerated Transportation, Inc., Indiana Refrigerator Lines, Inc., Rowley Interstate Transportation Co., Inc., Subler Transfer, Inc., Tompkins Motor Lines, Inc., and Watkins Motor Lines, Inc.

a number of carriers eliminated the "consignee unloading" provisions in their tariffs and began providing unloading services, but did not increase line-haul rates to cover the cost of unloading. The carrier-unloading services were maintained until 1968, when thirty-two carriers filed tariffs which eliminated all carrier unloading, again without a change in line-haul rates.

On November 15, 1968, the Commission initiated an investigation into the lawfulness of the new tariffs,[2] but did not suspend their effectiveness. Similar filings were consolidated for investigation, and most of the filings were then suspended, pending further order of the Commission, in compliance with temporary restraining orders issued by two federal district courts.[3]

On July 11, 1969, Review Board No. 4 of the Commission ordered cancellation of most of the consignee unloading provisions on the ground that the carriers had not shown the proposed limitation of service to be just and reasonable without a concomitant reduction in line-haul rates. *Unloading Restrictions on Meats and Packinghouse Products*, 335 I.C.C. 391 (July 11, 1969). The Commission found it impossible to state how much carrier unloading actually had taken place under the tariffs in effect from 1958 to 1968;[4] it found, however, substantial evidence that consignees had abused the carrier-unloading rules:

"The evidence submitted by respondents deals mainly with the reasons which lead them to publish the proposed 'no-unloading' rules. As stated on brief for a group of respondents, 'the crux of the issue involved herein was the unloading practices that the carriers have been subjected to when cargo of the type here involved was tendered for delivery to consignees in the East and in the South.'

According to respondents, such unloading practices (referred to sometimes as 'abuses') by or at the premises of consignees have included: refusal by a consignee to permit the truck driver to unload when ready, or at all; coercion of the driver into employment of a particular unloading crew, consisting in some cases of consignee personnel and sometimes of persons of obscure identity; imposition of an arbitrary unloading charge in the range of from $40 to $45 and sometimes more." 335 I.C.C. at 396. The Commission agreed "in principle" that the carriers had adequate reason to publish rates which did not include unloading services; the tariffs were rejected because there had not been a cost showing that the line-haul rates would be just and reasonable for the diminished service.

The carriers sought judicial review of the Review Board's decision, and the case was remanded to the Commission for further hearings in *Refrigerated Transport Co. v. United States*, 313 F.Supp. 880 (N.D.Ga. 1970). The court held that the ICC had given insufficient notice that it intended to investigate both the rules and the rates proposed in the 1968 tariffs, and ordered that the carriers be given an opportunity to present economic justification of their line-haul rates without unloading service.

One result of the orders issued by the court in *Refrigerated Transport* was that the proposed "no-unloading" tariffs were able to become effective by late 1969. The court's temporary restraining order, issued November 28, 1969, and the decision on the merits had the effect of reopening the Commission's investigation, thus limiting the Commission to a seven-month suspension of the tariffs before they became effective. 49 U.S.C. § 316(g).

**2.** The lead docket is entitled *Unloading Restrictions on Meats and Packinghouse Products*, Docket No. 35054. The various proceedings are described in the decision of ICC Review Board No. 4, *Unloading Restrictions on Meats and Packinghouse Products*, 335 I.C.C. 391 (1969).

**3.** *John Morrell & Co. v. United States*, Civil No. 68–C–1818 (N.D.Ill. Oct. 2, 1968); *Iowa Beef Packers, Inc. v. United States*, Civil No. 68–C–2043–C (N.D.Ill. Nov. 28, 1968).

**4.** Witnesses estimated that even under the carrier-unloading tariffs consignees chose to do their own unloading in anywhere from 10 to 40% of the time. 335 I.C.C. at 397 n. 8.

On remand, extensive hearings were conducted by Administrative Law Judge David H. Allard, who in 1972 (1) found the cost studies presented by the carriers to be insufficient to support the proposed tariffs, and (2) seeded the instant controversy by holding that carrier unloading had become sufficiently established as a trade practice to bar its cancellation by the carriers. *Unloading Restrictions on Meats and Packinghouse Products,* Docket No. 35054 (Jan. 17, 1972) (App. 13–44).

Judge Allard's extensive criticism of the carrier's cost data is not the subject of review in this proceeding. At issue is the threshold question whether the carriers operate under an unavoidable obligation to provide unloading service. Judge Allard founded his decision on the Commission's requirement that a common carrier extend "complete service" under its authority,[5] and held that requirement particularly applicable to specialized carriers such as meat haulers. He concluded that the operation of unloading services for ten years had created the obligation to continue, noting the hardship that had been caused to shippers who were unable to ship to their customers via a common carrier that provided unloading service:

> "The fact that [unloading] . . . service has been provided for many years has become the custom and trade practice. . . . Thus, even assuming, arguendo, that respondents initially did not have the obligation to unload, ordinary considerations of fairness in the Marketplace dictate that once an obligation, such as unloading, has been assumed by the carrier as part of its line-haul service and trade practices have developed in reliance thereon, that obligation becomes fixed upon the carriers.

> "Even respondents acknowledge that at least since 1958, it has been the general custom and practice of the trade for them to unload loose and carcass meat. . . . [T]he fact that unloading has been provided for over 10 years is sufficient to establish it as a general custom and trade practice upon which shippers and consignees have come reasonably to rely. . . .

> "Because of the inability of some consignees to unload loose and carcass meats, the record shows that at least some protestants have had difficult making sales, and have lost important customers . . . in the Southeastern Territory since the proposed rule became effective. Particularly hard-hit by the proposed rule have been shippers, such as Hormel, who cannot readily ship to the Southeast from plants in territories not affected by the proposed rule, as can many of its competitors. In addition, all Midwestern shippers have been competively injured by the proposed rule, vis-a-vis local meatpackers, who because of their proximity to the destination territory, do not have to rely upon common carriage to distribute their products, but can use private carriage instead."

Slip op. at 29.

On appeal to the Commission, Judge Allard's decision was affirmed substantially in

---

**5.** In *Restrictions on Service by Motor Common Carriers,* 111 M.C.C. 151 (1970), the Commission adopted 49 C.F.R. § 1307.27(k), which provides in pertinent part that "No provision may be published in tariffs . . . which results in restricting service to less than the carrier's full operating authority. . . ." The Commission reasoned as follows:

> "Common carriers by motor vehicle are a public institution upon which the general public must depend for adequate, economical, and efficient transportation. They are engaged in what has always been regarded as a public calling, and by reason of that fact they are subject to specific legal obligations. . . . This Commission's regulatory power over motor common carriers under the Interstate Commerce Act are designed to enforce these basic obligations comprehensively and strictly. Motor common carrier authority to serve imports a corresponding duty and obligation to serve."

111 M.C.C. at 161. The Commission's action was based on the National Transportation Policy, the preamble to the Interstate Commerce Act, which declares the purpose of regulation to be, *inter alia,* "to recognize and preserve the inherent advantages of each" mode of transportation, and "to promote safe, adequate, economical, and efficient service and foster sound economic conditions in transportation . . ."

a decision issued October 18, 1974. *Unloading Restrictions on Meat and Packinghouse Products,* 346 I.C.C. 775 (1974). The Commission agreed that the cost data submitted by the carriers was inadequate and, although finding that actual unloading practices varied substantially, 346 I.C.C. at 779, 791, 792, concluded in the most certain terms that delivery service is an integral and essential part of transportation service. It formulated the following structure for analysis of the obligation of shippers to provide unloading service as part of the delivery:

"[W]e conclude that the question whether loading or unloading, in connection with pickup and delivery, is an essential part of the transportation service must depend upon a case-by-case analysis of the terms of a carrier's outstanding authority in light of the statutory obligation to provide a complete service, the characteristics of the commodities transported, and the commercial needs and practices of the industry or shippers served."

346 I.C.C. at 792. The Commission concluded that there was a demonstrated commercial need for unloading services, and that the hardship that would be caused some consignees and shippers made elimination of the service an inappropriate response to the alleged abuses:

"As to whether a commercial necessity exists for carrier unloading, . . . [t]he main thrust of [the] . . . evidence is that there is a commercial need for carrier unloading since consignee unloading is not feasible, costwise, and cannot be undertaken by small receivers of these commodities. . . .

"Respondents have capably performed unloading in the past and can continue to do so if abuses at consignee's docks are eliminated. Total curtailment of unloading functions is not shown to be necessary to alleviate these abuses. . . . To completely end carrier unloading services adequately performed in the past for those consignees which have not created

the problems for respondents is unwarranted. Such consignees will suffer unnecessary hardships if respondents are permitted to curtail all unloading."

346 I.C.C. at 793, 794. Rejection of the proposed tariffs was held to be unconditionally mandated by both the Commission's regulations and the national transportation policy:

"In sum, the proposed consignee unloading rules are (1) unnecessary to prevent the abuses that have occurred, and (2) violate this Commission's tariff regulations requiring carriers to offer substantially the full scope of their authorized operations, consistent with the statutory requirement of section 216(b) that adequate and complete service be provided. *It would be wholly inconsistent with our basic philosophy of regulating transportation for us to allow carriers to disregard their responsibilities to provide needed services, and deprive the public of services it has been accustomed to receiving. Were we to permit this to occur, the entire congressional concept of regulation in accordance with the provisions of the national transportation policy would be defeated.*"

346 I.C.C. at 795 (emphasis added). Three Commissioners dissented, contending that the ten years of operation between 1958 and 1968 did not represent sufficient evidence of "trade practice" to create a legal duty. The dissenters also emphasized that it was unfair to impose as a legal duty a service the carriers had added with no increase in rates.

The October 18th decision prompted a large number of petitions for reconsideration. In its decision on reconsideration, issued March 14, 1975,[6] the Commission reaffirmed its holding that the cost evidence presented by the carriers was insufficient to justify the proposed tariffs, and ordered the tariffs cancelled. The Commission reversed itself, however, on the issue of the carriers' obligation to provide unloading services, holding that the obligation "should not be construed to require the holding out of a

---

6. *Unloading Restrictions on Meats and Packinghouse Products,* 349 I.C.C. 189 (1975).

carrier unloading service on loose and carcass meats." 349 I.C.C. at 198. The Commission based its decision upon "further consideration of the record," *id.,* but did not present any form of discussion of the evidence, despite its extended discussion supporting the contrary result just a few months earlier. The consideration discussed most fully by the Commission was its "official notice" of another case on its docket, designated I & S No. M–28143, in which three motor carriers proposed to reduce their line-haul rates on loose and carcass meats by 10 cents per 100 pounds, and to shift the burden of unloading to the consignee. The Commission noted that there was only one protest to that filing (by Kroger Co.), and stated that the filing's "proponents assert that this filing represents a compromise, acceptable to the meat shippers, consignees generally, and the carriers." 349 I.C.C. at 199. The inferred "acquiescence" of the shippers and consignees was felt by the Commission to demonstrate that the shippers and consignees did not have a true "commercial need" for unloading, but only a desire for lower rates:

> "In view of this general shipper and consignee acquiescence in a consignee-unloading rule when accompanied by a reduction in rates, we are no longer persuaded that there is a commercial need for carrier unloading. It appears, rather, that much of the shipper and consignee opposition to the proposal in the present proceeding stemmed from a desire for lower rates rather than a need for actual unloading by carrier employees. In addition to these circumstances, we note that

consignee unloading has, in fact, been the prevalent practice over the years, that carrier unloading provisions have tended to result in abusive practices toward carrier personnel, and that health regulations of various localities prohibit unloading of loose and carcass meats by carrier employees. In the absence of an actual necessity of consignees for carrier unloading, we think that these considerations are sufficient reason not to require maintenance of carrier unloading provisions." 349 I.C.C. at 199. The effect of the Commission's decision on reconsideration was to require carriers who wished to abandon their unloading service to file reduced line-haul rates which could be justified as reasonable for the reduced service.

Petitioners contend (1) that the Commission's inference of consignee acquiescence to elimination of carrier unloading services at a lower line-haul rate was unreasonable and unsupported by the evidence, (2) that the Commission's conclusion that there is no commercial necessity for carrier unloading was unsupported by substantial evidence, and (3) that the Commission's order contravened the National Transportation Policy[7] and the Interstate Commerce Act.

## II. THE STANDARD OF REVIEW

■ The Commission's order is the product of informal rulemaking under Section 4 of the Administrative Procedure Act, 5 U.S.C. § 553(c).[8] Although there is no consensus among the circuits as to the appropriate standard of review,[9] the law of this circuit is clear: informal rulemaking is

7. *See* n. 5, above.

8. 5 U.S.C. § 553(c): "After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose. When rules are required by statute to be made on the record after opportunity for an agency hearing, sections 556 and 557 of this title apply instead of this subsection."

The Interstate Commerce Act, although requiring that ratemaking orders be made "after hearing," 49 U.S.C. § 316(g), does not trigger a requirement that the Commission provide a hearing fulfilling all the requirements of Sections 556 and 557 of Title 5. *See United States v. Florida East Coast Railway Co.,* 410 U.S. 224, 234–238, 93 S.Ct. 810, 815, 35 L.Ed.2d 223, 232 (1973).

9. *See* Pederson, Formal Records and Informal Rulemaking, 85 Yale L.J. 38, 45–50 (1975); Note, Judicial Review of the Facts in Informal Rulemaking: A Proposed Standard, 84 Yale L.J. 1750 (1975).

reviewed under the standards of 5 U.S.C. § 706(2)(A)–(D), which provision requires in pertinent part that we set aside agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ." 5 U.S.C. § 706(2)(A). *Ethyl Corp. v. EPA*, No. 73–2205 (D.C. Cir. March 19, 1976) (*en banc*), slip op. at 66–67; *Amoco Oil Co. v. EPA*, 163 U.S.App.D.C. 162, 171, 501 F.2d 722, 731 (1974); *City of Chicago v. FPC*, 147 U.S.App.D.C. 312, 322–326, 458 F.2d 731, 741–745 (1971), *cert. denied*, 405 U.S. 1074, 92 S.Ct. 1495, 31 L.Ed.2d 808 (1972); *see* Wright, The Courts and the Rulemaking Process: The Limits of Judicial Review, 59 Cornell L.Rev. 375 (1974). Under this standard, we must uphold agency action if a rational basis exists for the decision. *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974). That is not to say, however, that an order inadequately supported when issued later may be completed by a statement of reasons supplied by counsel. The Commission must "articulate [a] . . . rational connection between the facts found and the choice made." *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 246, 9 L.Ed.2d 207, 216 (1962). An order "cannot be upheld merely because findings might have been made and considerations disclosed which would justify its order as an appropriate safeguard for the interests protected by the Act. There must be such a responsible finding. . . . " *SEC v. Chenery Corp.*, 318 U.S. 80, 94, 63 S.Ct. 454, 462, 87 L.Ed. 626 (1943). *Accord, FPC v. Texaco, Inc.*, 94 S.Ct. 2315, 2325, 41 L.Ed.2d 141, 155, 417 U.S. 380, 395–397 (1974); *see National Welfare Rights Organization v. Mathews*, 174 U.S.App.D.C. 410, 533 F.2d 637 (1976); *Amoco Oil Co. v. EPA*, 163 U.S.App.D.C. 162, 179–181, 501 F.2d 722, 739–741 (1974); *Portland Cement Ass'n v. Ruckelshaus,* 158 U.S.App.D.C. 308, 486 F.2d 375 (1973), *cert. denied,* 417 U.S. 921, 94 S.Ct. 2628, 41 L.Ed.2d 226 (1974).

■ If it is established that the Commission has presented a rational basis for its action, our function is at an end. It is not for us to inquire into whether the decision, in this case to limit the statutory obligation of meat haulers to offer unloading services, is wise as a matter of policy, for that is left to the discretion and developed expertise of the agency.[10] This court repeatedly has emphasized, however, that an agency must demonstrate that it has "really taken a 'hard look' at the salient problems, and has . . . genuinely engaged in reasoned decision-making." *Greater Boston Television Corp. v. FCC,* 143 U.S.App.D.C. 383, 393, 444 F.2d 841, 851 (1970), *cert. denied,* 403 U.S. 923, 92 S.Ct. 2233, 29 L.Ed.2d 701 (1971). As Judge Leventhal noted in the *Greater Boston Television* decision, that obligation is magnified when the action constitutes a change from precedent or long-standing policy:

"Judicial vigilance to enforce the Rule of Law in the administrative process is particularly called upon where, as here, the area under consideration is one wherein the Commission's policies are in flux. An agency's view of what is in the public interest may change, either with or without a change in circumstances. But an agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored, and if an agency glosses over or swerves from prior precedents without discussion it may cross the line from the tolerably terse to the intolerably mute."

10. Our review is guided by the Supreme Court's formulation in *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971):

"Section 706(2)(A) requires a finding that the actual choice made was not 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' 5 U.S.C. § 706(2)(A) (1964 ed., Supp. V.) To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. . . . Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency."

143 U.S.App.D.C. at 394, 444 F.2d at 852. *See also, National Welfare Rights Organization v. Mathews,* 174 U.S.App.D.C. 410, at ——, 533 F.2d 637, at 648 (1976); *Amoco Oil Co. v. EPA,* 163 U.S.App.D.C. 162, 501 F.2d 722 (1974).

■ Our scope of review is defined by the above-cited precedent. We must determine whether the Commission has supplied a rational basis for its order; that is, whether it demonstrably has given reasoned consideration to the issues, and has reached a result which rationally flows from its conclusions.

## III. THE BASIS OF THE MARCH 14 ORDER

### A. *Consignee and shipper acquiescence*

The Commission's October 18 decision did not mandate that all meat haulers provide in their tariffs for a carrier unloading service. Rather, it recognized that unloading practices differed substantially, and concluded that the question whether unloading was essential depended on a case-by-case analysis of (1) the terms of the carrier's outstanding authority in light of the statutory obligation to provide a complete service, (2) the characteristics of the commodities transported, and (3) the commercial needs and practices of the industry or shippers served. 346 I.C.C. at 792.

Rather than following that policy of case-by-case analysis, the Commission chose to infer from the lack of protests in another docket that shippers and consignees would consent to consignee unloading if offered at reduced line-haul rates. It does not appear that any such acquiescence ever existed. Petitioners cite extensively in their brief to their challenges throughout the investigation to abandonment of unloading service under any circumstances,[11] and allege that their failure to protest in the proceeding noticed by the Commission was prompted by the expense of participation, the fact that many major receivers do not have plants in the affected region, and the knowledge that a major food chain (Kroger) already had filed a protest. Petitioners' brief at 32. Petitioners further posit that the Commission could have taken official notice of another similar proceeding, *Restrictions on Unloading of Meats,* No. 35250 (April 19, 1972) (Petitioners' brief, Addendum A), in which Administrative Law Judge George A. Dahan rejected a proposal for consignee unloading at a reduced rate and elimination of carrier unloading altogether, noting that "restriction against the application of truckload rates so as not to include unloading is bitterly opposed by the protestants." Slip op. at p. 4. Petitioners allege that in five other dockets the carriers withdrew their "no-unloading" tariffs after suspension by the Commission, rather than participate in an investigatory hearing. Petitioners' brief at 34.

The Commission has defended its use of official notice by observing that two of the nations' largest meat packers, Swift Fresh Meats Company and Armour and Company, actively supported the proposed tariffs in the noticed proceeding. Respondents' brief at 16. Petitioners have replied, however,

---

11. Petitioners' brief, 23–31. Petitioners clearly have pressed their objection to required consignee unloading from 1969 (e. g., NAFC Statement, February 21, 1969, App. 354–358: "Many of the receiving locations of NAFC members are totally unable to furnish unloading services for a vast variety of reasons including the inexact scheduling of motor vehicles. It would be impractical and unreasonably burdensome to require a food chain to have a crew available to unload motor carriers immediately upon arrival. . . . It is NAFC's position that the unloading of meats at destination is a service already properly included under line haul rates and in no circumstances could NAFC agree to tariff publications providing otherwise.")

through argument on the motions for reconsideration of the October 18th decision (e. g., EMPA Reply to Petitions for Reconsideration, February 3, 1975, App. 203–206: "Refrigerated contends that, as far as it is concerned, this proceeding should only determine what rate reduction is necessary in order to discontinue carrier unloading. EMPA cannot agree with Refrigerated's interpretation of the purpose of this proceeding. . . . The proper solution to this problem is a dual rate level whereby one rate level (the current rate level) is maintained wherein the carriers provide the unloading service and a second, lower rate level is maintained wherein the carriers do not unload.").

that Swift and Armour never were parties to the instant proceeding, and have listed Iowa Beef Packers, John Morrell & Co., Oscar Meyer & Co., Geo. A. Hormel & Co., Missouri Beef Packers, Inc., and Spencer Packing Co. among the meat packers who continue to object to the no-unloading tariffs. Petitioners' reply brief at 3–4.

It is undeniable that the Commission placed substantial reliance on its conclusion of acquiescence in its decision on rehearing. The Commission's conclusion, quoted above, was that "In view of this general shipper and consignee acquiescence . . . we are no longer persuaded that there is a commercial need for carrier unloading." 349 I.C.C. at 199. The Commission then recited the additional considerations (1) that consignee unloading has been the prevalent practice, (2) that carrier unloading has resulted in abuses, and (3) that health regulations of various localities prohibit carrier unloading, and concluded that "*[i]n the absence of an actual necessity of consignees for carrier unloading*, we think that these considerations are sufficient reason not to require maintenance of carrier unloading provisions." *Id.* (emphasis added)

■ To the extent that the Commission's decision was based on shipper and consignee acquiescence, its decision is not adequately supported. Both the Commission and the intervenors, however, have argued that the additional considerations listed in the decision establish a rational basis for the conclusion that there is no "commercial need" for carrier unloading.

B. *Commercial Need*

Prior to its decision on reconsideration, the Commission consistently had rejected the contention that an absence of commercial need for carrier unloading could be established by trade practice, consignee abuses, or problems with local health regulations. In accepting that contention on reconsideration, the Commission abandoned its "case-by-case" approach in favor of a decision of general application. It is not for us to ask whether this choice was the best policy decision; under the narrowed stan-dard of review applicable to this appeal, our sole concern is whether the Commission has given reasoned consideration to the problem and has presented a rational basis for its decision.

■ The first consideration recited by the Commission was that consignee unloading has, as a practical matter, been the prevalent practice "over the years." If supported, this observation could be an adequate ground for the general conclusion that carrier unloading is neither a matter of trade practice nor a commercial necessity. The Commission, however, provided no further discussion of its conclusion, and its unelaborated statement is insufficient basis for rejection of the extensive discussions by Administrative Law Judge Allard and by the Commission itself in its original decision.

Judge Allard, as noted above, found that it had become trade practice to rely upon carrier unloading, and concluded from "ordinary considerations of fairness" that the ten years during which shippers and consignees came to rely upon carrier unloading had created the obligation to continue the service. Respondents and intervenors all have attacked this conclusion on the same grounds, alleging that the ten-year period 1958–1968 was an aberration, with very little carrier unloading being performed either before or after that period.

■ Even were we to accept this argument, it was not made by the Commission in its order and cannot be a basis for affirmance. *SEC v. Chenery Corp., supra.* Although a "decision of less than ideal clarity" must be upheld "if the agency's path may reasonably be discerned," *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc., supra,* 419 U.S. at 486, 95 S.Ct. at 442, we are unable to discern the Commission's basis for its action.

The Commission had already rejected the contentions based on examination of time spans alone. It appears that the institution of carrier unloading in 1958 was designed to improve the market share of the common carrier meat haulers, and was the foundation of the motor common carriers' success-

ful competition with other carriers and with the railroads, which until that time had dominated the carriage of loose and carcass meat. Judge Allard noted in his decision that "although respondents in the initial proceeding herein disclaimed any special prowess in the handling of loose and carcass meat, it was solely on the basis of such special prowess that they were able to enlist shipper support for their extension applications and to secure authority from the Commission for the complete transportation of loose and carcass meats." Slip op. at 29. The Commission, in finding commercial need in its October 18th decision, specifically referred to one instance of diversion from rail to motor carriage as a result of carrier unloading,[12] and noted that "[t]he witness for NAFC affirmed the fact that motor carrier unloading made it possible to divert traffic from rail to motor service." 346 I.C.C. at 793.

The lack of carrier unloading before 1958 is of lessened significance if carrier unloading was the instrument by which the carriers were able to compete successfully. As for the fact that much carrier unloading has been discontinued since 1969, it must be remembered that this entire period represents the delay during which the proposed tariffs were effective pending final decision by the Commission. In the absence of an explanation by the Commission of its changed position on reconsideration, we cannot infer that the Commission has determined that its own proceedings were sufficiently protracted to establish the proposed tariffs as a trade practice.

 It must be concluded that the Commission did not demonstrate a rational basis for its conclusion that consignee unloading has been the custom and trade practice over the years, and that there is not a commer-cial need for carrier unloading. The Commission's two other possible grounds for its decision are (1) the alleged abusive practices toward carrier personnel and (2) that health regulations of various localities prohibit unloading of loose and carcass meats by carrier employees.

It must be noted that even if there were substantial factual bases for both considerations, they alone may not justify a decision that all of the carriers were entitled to discontinue unloading services. The Commission expressly so held in its October 18 decision, in which it concluded both that "[t]otal curtailment of unloading functions is not shown to be necessary to alleviate [the] abuses," and that "the practices of consignees, of charging the carriers for unloading with special help allegedly required by local health or other requirements" could not sanction complete elimination of unloading services. 346 I.C.C. at 794, 795.

Considering the abuses alleged by carriers in the form of extortion by loading personnel at the consignees' docks, the Commission suggested that the carriers establish two-tier tariffs under which unloading would be provided only if elected by the consignee, admonished the consignees that "any recurrence of these or similar abuses will force us to take appropriate corrective action," and concluded that consignees which had not caused problems should not be forced to suffer for the acts of others. 346 I.C.C. at 794–795. The Commission had considered the "health regulation" arguments to be subject to the same reasoning.

The examples of abuses cited by the intervenors (e. g., Brief of intervening respondents Altruk Freight System, et al., at pp. 46–51) do not add to this analysis. The intervenors allege that a two-tier tariff is

---

12. "The main thrust of this evidence is that there is a commercial need for carrier unloading since consignee unloading is not feasible, costwise, and cannot be undertaken by small receivers of these commodities. A significant point is raised in the evidence submitted by Colonial Stores. It switched from rail to motor service for 60 percent of its shipments when respondents serving this consignee represented they would haul the products in specialized service directly to consignee's docks in mechanically refrigerated vehicles equipped with rails and hooks and the carriers' drivers would be willing and able to unload. Since the consignee unloading rule became effective in 1968, Colonial has diverted 95 percent of its 40 truckloads a week to rail piggyback or motor carriers in other territories which do not have the consignee-unloading rule." 346 I.C.C. at 793.

not workable; they claim that when consignees are given the option of carrier unloading, they consistently take it, and the abuses continue. The carriers' allegations are entitled to consideration by the Commission. Carriers whose unloading services are abused easily could apply to the Commission for permission to refuse service to specific consignees; the request could not take longer to process than this proceeding has taken before reaching this court.

In its order on reconsideration, however, the Commission did no more than recite the problems of abuses and health regulations, without indicating why it had chosen to reject the reasoning of its initial decision. We will not postulate possible explanations, nor weigh the complaints of intervenors about the two-tier system. Judicial review can be meaningful only if we are fully informed of the bases of agency action, and the order under review is singularly lacking in information. It must be concluded that the Commission did not demonstrate that its conclusion as to the commercial need for unloading services was supportable on the record before it.[13]

## IV. CONCLUSION

■ Viewed in the most favorable light, the Commission's order on reconsideration is lacking in the sort of reasoned consideration that is necessary for judicial review. We may not reverse agency action when a rational basis has been presented, and it would be equally irresponsible for us to affirm agency action when no rational basis is apparent.

The Commission's order on reconsideration is vacated, and the case remanded for further proceedings not inconsistent with this opinion.

---

13. As our decision is grounded on the Commission's failure to provide a rational basis for its action, we do not reach the question whether the statutory obligation of the carriers to provide a complete transportation service includes a requirement that unloading services be offered. *See* n. 5, above.