587 F.2d 1285
 190 U.S.App.D.C. 388
 FOOD MARKETING INSTITUTE and Eastern Meat Packers
Association, and Colorado Meat Dealers
Association, Petitioners,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents,
Curtis, Inc., Southern Motor Carriers Rate Conference, Inc.,
Coldway Food Express, Inc., Colonial Refrigerated
Transportation, Inc., Rowley Interstate Transportation Co.,
Inc., Subler Transfer, Inc., Watkins Motor Lines, Inc., Clay
Hyder Trucking, Inc., Central & Southern Truck Lines, Inc.,
Altruk Freight System, Inc., Bonney Motor Express, Inc.,
Refrigerated Transport Co., Inc., Intervenors.
 No. 77-1763.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Sept. 22, 1978.
Decided Oct. 17, 1978.
 
 Ronald K. Kolins, Washington, D. C., with whom Edwin H. Pewett and Allan I. Mendelsohn, Washington, D. C., were on the brief, for petitioners.
 Kenneth P. Kolson, Atty., I.C.C., Washington, D. C., with whom Mark L. Evans, Gen. Counsel, Frederick W. Read, III, Associate Gen. Counsel, I.C.C., John J. Powers, III, and Robert Wiggers, Attys., Dept. of Justice, Washington, D. C., were on the brief, for respondents.
 
 
 1
 Paul M. Daniell, Atlanta, Ga., a member of the bar of the Supreme Court of Georgia, by special leave of the Court pro hoc vice, with whom E. Stephen Heisley, Elizabeth A. Purcell, Marshall Kragen and Lester R. Gutman, Washington, D. C., were on the brief, for intervenors, Coldway Food Express, Inc., et al.
 
 
 2
 Bruce E. Mitchell and Richard M. Tettelbaum, Atlanta, Ga., were on the brief, for intervenor, Refrigerated Transport Co., Inc.
 
 
 3
 Jeffrey Kohlman, Atlanta, Ga., was on the brief, for intervenor, Southern Motor Carriers Rate Conference, Inc.
 
 
 4
 Richard A. Peterson, Lincoln, Neb., entered an appearance for intervenor, Curtis, Inc.
 
 
 5
 Robert L. Thompson, Atty., U. S. Dept. of Justice, Washington, D. C., entered an appearance for respondent, United States of America.
 
 
 6
 Before McGOWAN and TAMM, Circuit Judges, and GREEN,* United States District Judge for the District of Columbia.
 
 
 7
 Opinion for the Court filed by Circuit Judge McGOWAN.
 
 McGOWAN, Circuit Judge:
 
 8
 Petitioners in this direct review proceeding challenge a report and order of the Interstate Commerce Commission entered on remand from a previous decision of this court, National Association of Food Chains, Inc. v. ICC, 175 U.S.App.D.C. 346, 535 F.2d 1308 (1976). The ultimate issue for decision here is whether motor common carriers of loose and carcass meats must offer the service of unloading as part of their tariffs.
 
 
 9
 * Petitioner Food Marketing Institute is a nonprofit trade association of food wholesalers and retailers.[1] The other petitioners, Eastern Meat Packers Association and Colorado Meat Dealers Association, are trade associations of independent meat packers. The intervenors are motor common carriers that transport loose and carcass meats pursuant to certificate authority of the Commission.[2]
 
 
 10
 The prior history of this case is summarized in Nat'l Ass'n of Food Chains, supra, and will be recapitulated only briefly here. Beginning in 1958, a number of carriers filed tariffs providing for unloading services of loose and carcass meats.[3] In 1968, thirty-two carriers filed tariffs that eliminated all carrier unloading. These tariffs were challenged by shippers and consignees, and there followed a complex series of administrative and judicial proceedings, during the course of which the proposed tariffs were allowed to become effective. The present controversy was seeded by a 1972 decision by Administrative Law Judge David H. Allard that carrier unloading had become sufficiently established as a trade practice to bar its cancellation by the carriers. Unloading Restrictions on Meats and Packinghouse Products, I.C.C. Doc. No. 35,054 (Jan. 17, 1972).
 
 
 11
 On October 18, 1974, the Commission substantially affirmed Judge Allard's decision. Unloading Restrictions on Meats and Packinghouse Products, 346 I.C.C. 775 (1974) (1974 Order ). The Commission first formulated a general analytical approach to determining a carrier's obligation to provide unloading services. See text accompanying note 12 Infra. Applying this analysis, the Commission concluded that there was a demonstrated commercial need for unloading services and that the carriers' reasons for desiring to terminate the service were insufficient in light of the hardship that would be caused some consignees and shippers. 346 I.C.C. at 793-94.
 
 
 12
 On March 14, 1975, however, the Commission on reconsideration reversed itself as to this issue,[4] holding for the first time that carriers were not obligated to provide unloading services. Unloading Restrictions on Meats and Packinghouse Products, 349 I.C.C. 189 (1975) (1975 Order ). The Commission relied, in large measure, on inferences drawn from another case on its docket, in which three motor carriers proposed to eliminate the unloading service while reducing their line-haul rates. Noting that there had been only one protest to that filing, the Commission concluded that shippers and consignees were willing to accept, as a compromise, a reduction in rates in exchange for loss of the unloading service. 349 I.C.C. at 199.
 
 
 13
 On direct review, this court vacated and remanded the 1975 Order. National Association of Food Chains, Inc. v. ICC, 175 U.S.App.D.C. 346, 535 F.2d 1308 (1976). The court concluded that the order under review was the product of informal rulemaking, to be reviewed under the "rational basis" test,[5] but found the order defective even under this relatively lenient standard. The Commission's principal error, according to the court, was its inference from the lack of protests in another docket that shippers and consignees were willing to acquiesce in the elimination of carrier unloading provided they received a reduction in line-haul rates in exchange.[6] Observing that "(i) t does not appear that any such acquiescence ever existed,"[7] the court held that the Commission's inference was not supported by the evidence.
 
 
 14
 The court proceeded to analyze three further grounds suggested as support for the Commission's decision. One was the argument, accepted by the Commission for the first time in its 1975 Order, that consignee unloading had in fact been the prevalent trade practice through the years. The court observed that this conclusion, if supported by the evidence, would provide sufficient support for a consignee-unloading rule, but found that the Commission had not demonstrated a rational basis for its conclusion.[8] The second and third possible grounds were abusive practices toward carrier personnel that allegedly occurred at consignees' receiving platforms, and health regulations of various localities that allegedly prohibited unloading of loose and carcass meats by unqualified carrier employees. The court found it unnecessary to decide whether the existence of these abusive practices or restrictive health regulations had been adequately demonstrated: even if there were "substantial factual bases for both considerations, they alone may not justify a decision that all of the carriers were entitled to discontinue unloading services."[9] The flaw in the Commission's analysis of these issues, in the court's view, was its failure to explain why it had deviated from its previous conclusion that the problems of abuses and health regulations could be solved by means other than elimination of the carrier unloading service.
 
 
 15
 On remand, the Commission adhered to its conclusion that the motor common carriers need not offer the services of unloading loose and carcass meats, Report and Order of the Commission on Further Consideration, Unloading Restrictions on Meats & Packinghouse Products, I.C.C. Doc. No. 35,054 (June 23, 1977) (1977 Order ), and petitioners once again brought the case before this court on direct review.
 
 II
 
 16
 The major thrust of petitioners' challenge is to the Commission's analysis on remand of the evidence of record. Petitioners argue that the Commission's factual conclusions were not supported by the evidence and that the Commission improperly imposed the burden of proof on them rather than on the carrier proponents of the tariffs.
 
 A.
 
 17
 As we have already noted, See text accompanying note 5 Supra, this court in Nat'l Ass'n of Food Chains held that the Commission's determination was to be reviewed under a "rational basis" test. Petitioners argue, however, that this court should now apply the more demanding " substantial evidence" test used to review agency adjudication and formal rulemaking, See Administrative Procedure Act, 5 U.S.C. §§ 556, 557. Their position is that, while the Commission's previous decision resulted in a rule of general applicability, and was therefore the product of informal rulemaking, the order now under review was limited in scope to the particular tariffs at issue and hence should be considered the result of an adjudication.
 
 
 18
 Our application of the "rational basis" test in Nat'l Ass'n of Food Chains, however, was not based on the fact that the agency decision under review was of general applicability. Rather, we concluded that since the "hearing" required in ratemaking proceedings by the Interstate Commerce Act, 49 U.S.C. § 316(g), was not the equivalent of a hearing for rules "made on the record" under the Administrative Procedure Act, 5 U.S.C. § 553(c),[10] the Commission's decision was the product of informal rulemaking rather than adjudication. 175 U.S.App.D.C. at 351 n.8, 535 F.2d at 1313 n.8. See United States v. Florida East Coast R. Co., 410 U.S. 224, 234-38, 93 S.Ct. 810, 35 L.Ed.2d 223 (1973). This conclusion, of course, was not contingent on the generality of the Commission's decision.
 
 
 19
 Our review is therefore limited to a determination of whether the Commission's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ." 5 U.S.C. § 706(2)(A). We must uphold the agency if there exists a rational basis for the decision, Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc., 419 U.S. 281, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974); Nat'l Ass'n of Food Chains, supra, 175 U.S.App.D.C. at 352, 535 F.2d at 1314. Although our inquiry into the facts is to be "searching and careful," the ultimate standard of review is narrow. Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).
 
 
 20
 However, because of the posture of this case, a somewhat greater degree of scrutiny than might otherwise be appropriate is in order. For one thing, the agency order under review here reaffirmed a decision that itself departed drastically from the Commission's 1974 Order requiring these carriers to provide unloading services. While agencies may not be bound under the doctrine of Stare decisis to the same degree as courts, See, e. g., FCC v. WOKO, Inc., 329 U.S. 223, 228, 67 S.Ct. 213, 91 L.Ed. 204 (1946); New Castle County Airport Comm'n v. CAB, 125 U.S.App.D.C. 268, 270, 371 F.2d 733, 735 (1966), Cert. denied sub nom. Board of Transportation v. CAB, 387 U.S. 930, 87 S.Ct. 2052, 18 L.Ed.2d 991 (1967), it is at least incumbent upon the agency carefully to spell out the bases of its decision when departing from prior norms. Secretary of Agriculture v. United States, 347 U.S. 645, 652-53, 74 S.Ct. 826, 98 L.Ed. 1015 (1954); Office of Communication of United Church of Christ v. CAB, (D.C.Cir. Sept. 11, 1978), slip op. at 13. Secondly, the order under review here comes to precisely the same conclusion as the order previously remanded by this court. To be sure, where, as here, the remand merely requires the agency further to elaborate its reasoning, there is no requirement that the agency arrive at a different substantive result upon reconsideration. At the same time, we must recognize the danger that an agency, having reached a particular result, may become so committed to that result as to resist engaging in any genuine reconsideration of the issues. The agency's action on remand must be more than a barren exercise of supplying reasons to support a pre-ordained result. Post-hoc rationalizations by the agency on remand are no more permissible than are such arguments when raised by appellate counsel during judicial review. See Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962).
 
 B.
 
 21
 Before evaluating whether the Commission's order passes muster under this standard of review, it is necessary to examine the legal framework within which the Commission evaluated the facts of record. The substantive statute at issue is section 216(b) of the Interstate Commerce Act, 49 U.S.C. § 316(b), which provides in relevant part:[11]
 
 
 22
 It shall be the duty of every common carrier of property by motor vehicle to provide safe and adequate service, equipment, and facilities for the transportation of property in interstate or foreign commerce (and) to establish, observe, and enforce just and reasonable . . . regulations and practices relating thereto . . . .
 
 
 23
 The Commission, in its 1974 Order, exercised its broad discretion in interpreting the meaning of "safe and adequate service" in the context of a motor carrier's duty to load or unload:[12]
 
 
 24
 (W)e conclude that the question whether loading or unloading, in connection with pickup and delivery, is an essential part of the transportation service must depend upon a case-by-case analysis of the terms of a carrier's outstanding authority in light of the statutory obligation to provide a complete service, the characteristics of the commodities transported, and the commercial needs and practices of the industry or shippers served.
 
 
 25
 Petitioners challenge this construction as improperly imposing the burden of proof as to the reasonableness of the proposed tariff changes on them. They correctly point out that under section 216(g) of the Interstate Commerce Act, 49 U.S.C. § 316(g), the burden of proof is on the carriers to show the rule change to be just and reasonable.[13] We do not find, however, that the Commission's construction imposes a burden of proof either on the carriers or on the opponents of the tariffs; rather, it simply lists the factors to be considered by the Commission in each case.[14]
 
 
 26
 The Commission's analytical framework does not explicitly recognize the needs of the carriers as a factor to be considered. The factor of the "characteristics of the commodities transported," however, can reasonably be read as incorporating a concern for carrier interests. For example, the problem of abuses as consignees' receiving platforms resulted from the fact that loose and carcass meats generally require two men to unload.[15] Similarly, the problems with health regulations resulted from the fact that the commodities transported are foodstuffs that come into direct contact with the skin and clothing of the worker during unloading.[16] Thus, it was not improper for the Commission, under its analytical framework, to consider the interests of carriers as well as those of consignees and shippers. In practice, the Commission's analysis has functioned as a balancing test, a weighing of opposing interests, and we will so treat it herein.[17]
 
 C.
 
 27
 Our duty, then, is to determine, under the standard of review previously described, whether the Commission properly identified the opposing interests in light of the facts of record, and rationally balanced them against each other. Petitioners charge that the 1977 Order was not so based, and that the Commission, in evaluating the facts, improperly imposed the burden of proof on them. We find, however, that the Commission's analysis of the competing needs of the carriers, on the one hand, and the shippers and consignees, on the other, was rationally based and did, in substance, impose a correct burden of proof.
 
 
 28
 The Commission, in its 1977 Order, gave greatly expanded consideration to the needs of the carriers. It concluded from the record that, because of a number of circumstances, drivers were frequently unable to unload the meat themselves. Drivers not accompanied by a co-driver were physically unable to unload the meat without assistance of at least one other worker.[18] Drivers were also frequently unable to obtain and keep current the local health credentials needed for the handling of these commodities. Even if the driver could otherwise unload, he was frequently prevented from doing so by practices at the consignees' receiving platform. Either the consignee would require that the unloading be undertaken by its own employees, or individuals not formally associated with the consignee would force the driver to hire gangs of casual laborers at extortionate rates.
 
 
 29
 These problems were apparently exacerbated by the increasing use of independent owner-operators who delivered the commodities pursuant to a contract with the carrier. These owner-operators lacked the resources to combat the demands of individuals at the consignees' receiving platforms and were unable to control the spiralling prices of unloading services.[19] As a result, the carriers experienced a high number of owner-operator resignations and had difficulty in recruiting replacements for those who quit.[20]
 
 
 30
 We conclude that the Commission, in its 1977 Order, adequately demonstrated the existence of abusive practices and local health regulations that had a substantial detrimental effect on the carriers. Our decision in Nat'l Ass'n of Food Chains, however, held that the mere existence of these problems was not sufficient; it was necessary also that the Commission provide reasons why alternative solutions, not involving elimination of carrier unloading, would be unworkable. 175 U.S.App.D.C. at 355, 535 F.2d at 1317. This the Commission failed to do in its 1975 Order.
 
 
 31
 The 1977 Order, in contrast, provides a detailed explanation of why possible alternative solutions are not feasible. The Commission rejected the alternative of a two-tier tariff, providing for higher rates for carrier unloading than consignee unloading, because the drivers would still be subject to arbitrary charges at the consignees' receiving platforms. 1977 Order, at 24. It rejected the possibility of detention charges, in cases where drivers were delayed for refusing to deal with local crews, on the ground that this alternative had always been available but had not prevented the abuses. Id. Also found inadequate was the alternative of surveillance and corrective action by the Commission itself. The Commission noted, primarily, that "policing of all the locations where the subject traffic is delivered would be an enormous drain on the Commission's limited resources." Id.[21]
 
 
 32
 The 1977 Order also gives more careful attention to the needs of the consignees and shippers. The Commission, for one thing, has abandoned its inference of acquiescence in consignee unloading drawn from the lack of protests to a tariff filing in another proceeding in which carrier unloading was eliminated. See text accompanying notes 6-7 Supra. Our decision in Nat'l Ass'n of Food Chains, of course, disapproved this inference. 175 U.S.App.D.C. at 352, 535 F.2d at 1315.
 
 
 33
 The Commission has also receded from its position in the 1975 Order, 349 I.C.C. at 199, that consignee unloading was the trade practice in the industry. It now takes the agnostic view that the "evidence shows that carrier unloading of these commodities was not sufficiently established as a trade practice to create, in itself, a commercial necessity for carrier unloading." 1977 Order, at 21. We are of the view that the evidence of record on this issue is simply too sketchy to support a definitive conclusion one way or the other. There is virtually no evidence as to whether, prior to 1958, tariffs contained carrier unloading provisions, or as to the extent of motor carrier transportation of these commodities during that period.[22] The evidence shows that seven of the sixteen respondent carriers either adopted carrier unloading provisions or commenced unloading in 1958 or thereafter; but the record is silent as to when the remaining nine carriers may have adopted such a practice.[23] Although it was contended that the carriers commenced the unloading service in an effort to wrest business away from the railroads, the record is devoid of specific support for this conclusion.[24]
 
 
 34
 The sum of this evidence, in our view, was insufficient to compel any particular conclusion on the trade practice question. The Commission's wavering approach to the issue best illustrates this point: in 1974, it affirmed the decision of Administrative Law Judge Allard, which had found carrier unloading to be sufficiently established as a trade practice to bar its cancellation by the carriers, 1974 Order, 346 I.C.C. at 795; in 1975, it noted that "consignee unloading has, in fact, been the prevalent practice over the years," 1975 Order, 349 I.C.C. at 199; and in 1977, as we have noted, it shifted to a non-committal middle ground. In our view, the Commission's 1977 conclusion was a rational response to the record evidence before it.
 
 
 35
 The paucity of evidence on the trade practice question does not constitute a serious flaw in the Commission's analysis because, in our view, the question of trade practice is an aspect of a broader inquiry into the commercial needs of consignees and shippers. The 1977 Order analyzes with some care the extent to which elimination of carrier unloading would prejudice either group in the running of their businesses. The Commission found, on the basis of the evidence, that while consignee unloading "may cause some inconvenience at certain locations," consignees were physically capable of performing the unloading task. 1977 Order, at 15-16. Many consignees already employed unloading personnel; others could hire new workers. In either case the consignees might incur additional costs, but these expenses could presumably be recouped through reductions in line-haul rates.[25] The Commission also noted the possibility that consignees could hire casual laborers on a piecework basis in a way similar to the common practice under the carrier unloading rule. In the Commission's view, consignees would have much greater control over such casual laborers and therefore would not be subject to the abuses that grew up under the carrier unloading regime. 1977 Order, at 15-16. The Commission also found that a consignee unloading rule would not impair the shippers' business. Id. at 17. Because these conclusions are rationally based, See text following note 10 Supra, we must accept them in the exercise of our limited review function.
 
 
 36
 The Commission, having evaluated the needs of the carriers and those of the consignees and shippers, then had to balance those needs against each other, See text accompanying note 12 Supra ; note 17 and accompanying text Supra. This balancing will inevitably involve questions of policy that the Commission, because of its expertise and specialized function, is best situated to evaluate. We therefore review the Commission's balancing of the competing interests with considerable deference, Cf. Industrial Union Dep't v. Hodgson, 162 U.S.App.D.C. 331, 338, 499 F.2d 467, 474 (1974). The Commission described its reasons for striking the balance as it did as follows:[26]
 
 
 37
 In making these findings, we recognize that a consignee-unloading rule may entail some inconvenience at certain locations, and we do not take this fact lightly. We believe that shipper convenience must be served to the greatest extent possible. However, there comes a point where practical limitations on the carriers' service capabilities must be recognized, and we believe that such a point is reached in these proceedings. We are persuaded on this record that the problems resulting from mandatory unloading by respondents are of an intractable nature and are of far greater magnitude than those that result from the consignee-unloading rule. It is for this reason only, and after the most careful consideration of the facts presented, that we have concluded that a mandatory requirement for a carrier-unloading provision should not be imposed herein.
 
 
 38
 We find that the Commission has here provided sufficient articulation of its reasons for permitting elimination of the carrier unloading rule. See Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc., 419 U.S. 281, 286, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974).
 
 
 39
 Petitioners raise one additional challenge to the Commission's treatment of the evidence. They claim that while the burden of proof is placed by statute on the carrier proponents of the tariffs, 49 U.S.C. § 316(g), the Commission in its 1977 Order improperly shifted to burden to the tariff's opponents.[27] There is, indeed, language in the 1977 Order that might be read to convey this impression. The Commission for example, stated that "the evidence Falls short of proving " the existence of a commercial need for carrier unloading. 1977 Order, at 13 (emphasis added). Similarly, it found that "There has been no convincing demonstration that consignees cannot physically incorporate the unloading of loose and carcass meats into their operations." Id. at 16 (emphasis added). The Commission ultimately found, however, that the needs of the carriers are "of far greater magnitude" than those of the consignees and shippers. 1977 Order, at 27. While some of the Commission's language was perhaps unfortunate, we are persuaded that the 1977 Order, taken as a whole, did in fact properly allocate the burden of proof.
 
 III
 
 40
 Petitioners contend that, even if the Commission's factual conclusions are sustainable on the record, the tariffs should have been rejected because carrier unloading is required by statute.[28] We find no merit to these arguments.
 
 
 41
 Petitioners first cite section 216(b) of the Interstate Commerce Act, 49 U.S.C. § 316(b), Quoted in text accompanying note 11 Supra. The carriers' obligation under this statute to provide a "safe and adequate service" has been interpreted by the Commission to impose a duty to provide a "complete" transportation service.[29] Part of this complete service, according to petitioners, is the obligation of carriers of loose and carcass meats to provide unloading services.[30] We agree with the Commission's 1977 Order, however, that the obligation to provide a complete service does not require the carriers to offer every service they might have authority to offer under the terms of their certificates. See 1977 Order, at 10. A contrary interpretation, as the Commission points out, would lead to the danger that carriers would avoid entering into new and innovative services out of a fear of being "locked in" to obligations that might prove detrimental. Id. at 29.
 
 
 42
 Petitioners next cite to the National Transportation Policy, preamble to the Interstate Commerce Act, 49 U.S.C. Preceding § 1, which expresses the national policy "to recognize and preserve the inherent advantages" of each mode of transportation.[31] They argue that an inherent advantage of motor carriers is their ability to provide a complete service, store-door to store-door, including loading and unloading. It is possible that the ability of a motor carrier to make store-door Deliveries might be seen as an inherent advantage of motor transportation within the meaning of the National Transportation Policy. Cf. ICC v. Mechling, 330 U.S. 567, 67 S.Ct. 894, 91 L.Ed. 1102 (1947) (inherent advantage of cheaper rates for barge transportation). But this postulated advantage of motor carriers, which stems from their greater mobility as compared with other forms of transportation, in no way supports the argument that Unloading is an inherent advantage of motor transportation.
 
 
 43
 We conclude that the 1977 Order has adequately met the objections raised by this court in Nat'l Ass'n of Food Chains, supra. Because the Commission has now presented a rational basis for its conclusion that the carriers may eliminate from their tariffs the service of unloading loose and carcass meats, its order is
 
 
 44
 Affirmed.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. § 292(a)
 
 
 [1]
 Food Marketing Institute is the successor organization to the National Association of Food Chains, Inc., a petitioner in the prior litigation before this court
 
 
 [2]
 Intervenors participating in the briefing of this case are Southern Motor Carriers Rate Conference, Inc., Refrigerated Transport Co., Inc., Altruk Freight Systems, Inc., Bonney Motor Express, Inc., Central and Southern Truck Lines, Inc., Clay Hyder Trucking Lines, Inc., Coldway Food Express, Inc., Colonial Refrigerated Transportation, Inc., Rowley Interstate Transportation, Inc., Subler Transfer, Inc., and Watkins Motor Lines, Inc
 
 
 [3]
 The record is unclear as to the situation prior to 1958. See text accompanying note 22 Infra
 
 
 [4]
 The Commission upheld the 1974 Order's conclusion that the cost data submitted by the carriers were inadequate to support their proposed rates. Unloading Restrictions on Meats and Packinghouse Products, 349 I.C.C. 189, 191-96 (1975). It therefore ordered the tariffs cancelled. The carriers did not seek judicial review of this ruling; consequently, the cost justifications of particular rates are not at issue in this case
 
 
 [5]
 175 U.S.App.D.C. at 351-53, 535 F.2d at 1313-15. See text accompanying note 10 Infra
 
 
 [6]
 Id. 175 U.S.App.D.C. at 351-52, 535 F.2d at 1315-16
 
 
 [7]
 Id. 175 U.S.App.D.C. at 353, 535 F.2d at 1315
 
 
 [8]
 Id. 175 U.S.App.D.C. at 354, 535 F.2d at 1316
 
 
 [9]
 Id. 175 U.S.App.D.C. at 355, 535 F.2d at 1317
 
 
 [10]
 This section provides that:
 After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose. When rules are required by statute to be made on the record after opportunity for an agency hearing, sections 556 and 557 of this title apply instead of this subsection.
 
 
 [11]
 See also notes 29-30 and accompanying text Infra
 
 
 [12]
 346 I.C.C. at 792
 
 
 [13]
 Section 216(g) provides:
 At any hearing involving a change in a rate, fare, charge or classification, or in a rule, regulation, or practice, the burden of proof shall be upon the carrier to show that the proposed changed rate, fare, charge, classification, rule, regulation, or practice is just and reasonable.
 
 
 [14]
 Although the Commission's construction of § 216(b) is not invalid as an improper allocation of the burden of proof, we have somewhat greater difficulty with the way in which the Commission applied this standard to the facts of record in this case. See text accompanying note 27 Infra
 
 
 [15]
 See note 18 Infra ; text accompanying notes 18-19 Infra
 
 
 [16]
 See note 18 Infra
 
 
 [17]
 As the Commission put it in its 1977 Order :
 The third factor, the commercial needs and practices of the industry or shippers served, also has a clear bearing on whether the carriers themselves should be required to perform the particular service. The existence of such needs and practices may warrant the continuation of particular carrier services despite problems incurred by the carriers in providing them. However, this is not to say that major carrier operating problems should be ignored to avoid minor shipper inconvenience. Rather, The factors must be balanced, and the best practical solution sought.
 1977 Order, supra, at 10 (emphasis added). See also text accompanying note 26 Infra.
 
 
 [18]
 The Commission found that
 Beef carcasses weigh about 175 pounds, and are transported unwrapped, suspended by hooks from overhead rails in the trailer. Their unloading requires at least two men, and must be done under the most sanitary conditions possible. One unloader must grasp the beef with both arms, lift it, and after another loader disengages and removes the hook, carry the beef out of the trailer to a rail on the receiving platform where it is hung by another hook.
 1977 Order, supra, at 11.
 
 
 [19]
 Petitioners suggest that, insofar as these abuses stem from the carriers' increasing use of owner-operators, the proper subject for Commission regulation is the contractual relation between the carriers and the owner-operators. It was within the Commission's discretion, however, to seek to achieve its regulatory objectives through the existing tariff process rather than through new and untested regulation of owner-operators. Moreover, it is difficult to see how control of the carrier owner-operator contract could eliminate the coercive practices at the consignees' receiving platforms
 
 
 [20]
 This analysis is presented in the Commission's 1977 Order in conclusory terms, without reference to the record support, if any, for the inferences reached. It would have been more helpful had the Commission, in its order as distinct from counsel's brief on appeal, explicitly demonstrated such record support. First and foremost, citations to the record are necessary if judicial review is to be meaningful. In administrative cases, where the record can run in the thousands of pages, the court cannot be expected fully to grasp the factual issues without some sort of guide as to where the relevant passages are located. In this case, where judicial review of the Commission's order was a near-inevitability, there was a special reason for the agency to provide record references. In addition to facilitating judicial review, references to the record are persuasive indications that the agency did consider the relevant facts. When only the brief prepared by the agency's counsel presents the record references during appellate litigation, the reviewing court may be inclined to give the agency's stated justifications somewhat less credence
 Despite these considerations, we are convinced that the record references provided by the Commission's counsel demonstrate that the 1977 Order was indeed based on meaningful review of the record and not on mere abstract speculation.
 
 
 [21]
 Petitioners suggest that the Commission, rather than policing all locations, could simply investigate instances of reported abuses and initiate enforcement proceedings where necessary. The Commission could rationally have concluded, however, that given the coercive setting at the consignees' receiving platforms, abuses were likely to be under-reported, and that even when reports were made, after-the-fact Commission investigation and enforcement was unlikely to have a major deterrent effect
 
 
 [22]
 1977 Order, at 20
 
 
 [23]
 Id
 
 
 [24]
 Id. at 21-22
 
 
 [25]
 As we have noted, rates are not an issue in this case, See note 4 Supra. The Commission in its 1974 Order, however, indicated that it would not accept elimination of carrier unloading without a concomitant reduction in line-haul rates. 1974 Order, 346 I.C.C. at 786
 
 
 [26]
 1977 Order, at 27
 
 
 [27]
 Although this argument is framed as an objection to the Commission's analytical framework, See text accompanying note 12 Supra, its real force goes to the way in which the Commission has actually applied that framework. See text accompanying notes 13-14 Supra
 
 
 [28]
 This court in Nat'l Ass'n of Food Chains found it unnecessary to reach this question. See 175 U.S.App.D.C. at 356 n.13, 535 F.2d at 1318 n.13
 
 
 [29]
 See Restrictions on Service by Motor Common Carrier, 111 M.C.C. 151 (1970). See also 49 C.F.R. § 1307.27(k)(1) (1974) ("No provision may be published in tariffs (which results in restricting) service to less than the carrier's full operating authority. . . .")
 
 
 [30]
 This argument was accepted by the Commission in its 1974 Order, 346 I.C.C. at 795
 
 
 [31]
 The National Transportation Policy provides that:
 It is hereby declared to be the national transportation policy of the Congress to provide for fair and impartial regulation of all modes of transportation subject to the provisions of this Act, so administered as to recognize and preserve the inherent advantages of each; to promote safe, adequate, economical, and efficient service and foster sound economic conditions in transportation and among the several carriers; to encourage the establishment and maintenance of reasonable charges for transportation services, without unjust discriminations, undue preference or advantages, or unfair or destructive competitive practices; to cooperate with the several States and the duly authorized officials thereof; and to encourage fair wages and equitable working conditions; all to the end of developing, coordinating, and preserving a national transportation system by water, highway, and rail, as well as other means, adequate to meet the needs of the commerce of the United States, of the Postal Service, and of the national defense. All of the provisions of this Act shall be administered and enforced with a view to carrying out the above declaration of policy.
 49 U.S.C. Preceding § 1.